14-1012
Tolbert v. Smith

## UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2014

Argued: January 7, 2015     Decided: June 24, 2015
Docket No. 14-1012-cv

_____

RICKEY L. TOLBERT,

*Plaintiff-Appellant*,

—v.—

RICHARD SMITH AND ROCHESTER CITY SCHOOL DISTRICT,

*Defendants-Appellees*.

_____

Before: LYNCH AND CARNEY, Circuit Judges, and KOELTL, District
Judge.[*]

The plaintiff, Rickey Tolbert, appeals from the judgment of the United States District Court for the Western District of New York (Siragusa, J.) dismissing his complaint. The district court granted summary judgment dismissing the plaintiff's claims for defamation, discrimination, and hostile work environment, in violation of federal and state anti-discrimination laws and New York State common law.

_____

[*] The Honorable John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

We affirm the judgment of the district court in all respects, except that we vacate the judgment dismissing the discrimination claims and remand as to those claims for further proceedings.

_____

DAVID ROTHENBERG, Greiger and Rothenberg, LLP, for Plaintiff-Appellant Rickey Tolbert.

MICHAEL E. DAVIS (Edwin Lopez-Soto, General Counsel, on the brief), Rochester City School District, Law Department, for Defendants-Appellees Richard Smith and Rochester City School District.

_____

John G. Koeltl, District Judge:

The plaintiff, Rickey Tolbert, is an African-American former teacher at John Marshall High School ("John Marshall") in the Rochester City School District (the "School District"). He appeals from a judgment of the United States District Court for the Western District of New York (Siragusa, J.). The district court granted summary judgment dismissing the plaintiff's claims of discrimination and hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 et seq.; and 42 U.S.C. § 1981. The district court also dismissed the plaintiff's defamation claim.

On appeal, Mr. Tolbert contends that he identified sufficient facts to establish a prima facie case of racial

2

discrimination, to show a hostile work environment, and to support a claim for defamation.  For the reasons explained below, we affirm the judgment of the district court except with respect to the discrimination claims, as to which there are genuine disputes as to material facts that preclude summary judgment based on Mr. Tolbert's prima facie case of discrimination.

**I.**

**A.**

Mr. Tolbert was a culinary arts teacher at John Marshall from 2006 to 2009.  He was a non-tenured, probationary teacher, who taught three culinary arts classes a day.

Because he was a probationary teacher, Mr. Tolbert's classes were observed by John Marshall administrators.  The reviewing administrator would then write a "Formal Teacher Observation."  The Formal Teacher Observation Form includes a space for written comments and also a "Summary of Performance" section that asks the evaluator to check one of five boxes.  The available boxes are "Distinguished," "Proficient," "Meets Professional Standards," "Below Professional Standards," and "Unsatisfactory."

At the end of each school year, Mr. Tolbert also received an annual evaluation by a John Marshall administrator.[1] The Annual Evaluation Form includes eighteen categories. The evaluator is asked to check one of five boxes for each category—which are the same as those on the Formal Teacher Observation Form—and provide written comments. The evaluator must also provide an "Overall Summary Rating," again by checking one of five boxes.

During his second year teaching, Mr. Tolbert consistently received marks of "Proficient" or "Meets Professional Standards" on his evaluations. Laurel Avery-DeToy, an administrator at John Marshall, conducted Mr. Tolbert's Formal Teacher Observations and his annual evaluation for the 2007–2008 school year. Mr. Tolbert has no complaints about these reviews.

**B.**

Before the start of the 2008–2009 school year, defendant Richard Smith was hired to replace Joseph Munno as the principal of John Marshall. According to Mr. Tolbert, this is when his employment situation started to sour.

Mr. Tolbert alleges that he did not receive a budget to purchase supplies for his classes. The size of his classes also grew. In the two previous years, he had around sixteen to

---

[1] The evaluations from the 2006-2007 school year were not included in the record.

4

eighteen students per class. In the fall of 2008, each of his classes had at least twenty-eight students—despite a collective bargaining agreement provision limiting at least one of his classes to twenty-four students. After Mr. Tolbert complained, the John Marshall administrators eventually reduced the number of students in his classes.

Mr. Tolbert also claims that many Individualized Education Plan students were placed in his classes, and he was not given the assistance of a paraprofessional. The defendants insist that due to budget cuts, a number of paraprofessional positions were eliminated. As a result, the Special Education Administrator determined that Mr. Tolbert would not be assigned a paraprofessional for the 2008–2009 school year. The defendants also note that twenty-three percent of the John Marshall students had Individualized Education Plans.

Mr. Tolbert also experienced some problems with the cleanliness and the maintenance of the kitchen in his classroom (known as the "Jurist Room"). In the fall of 2008, the Monroe County Department of Health and the New York State Department of Health identified various health code violations. As a result, Principal Smith closed the kitchen. The parties dispute the cause of these violations. Mr. Tolbert insists that the janitorial staff did not clean the kitchen regularly, and the

defendants contend that Mr. Tolbert and his students were—in part—at fault.

But these problems were not new.  In December 2007, Mr. Tolbert complained to school officials that the custodial staff was not cleaning the kitchen properly.  And in March 2008, the New York State Department of Health identified a number of health code violations in the kitchen.

## c.

Mr. Tolbert also alleges that Principal Smith made racist remarks.  In the fall of 2008, Mr. Tolbert volunteered to cook for a homecoming breakfast.  When discussing what food would be served, Mr. Tolbert alleges that Principal Smith asked him: "Do you only know how to cook black, or can you cook American too?" JA 332.

In October 2008, a student in Mr. Tolbert's class alleges that Principal Smith asked her if she was learning anything from Mr. Tolbert.  In January 2009, during a conversation about reopening the kitchen, Principal Smith asked the same student "how [she] expected to learn if all [she] was learning to cook was black food."  JA 450.  When asked to define "black food," Principal Smith allegedly said "that what he meant was American food."  Id.  And another one of Mr. Tolbert's students alleges that in January or February of 2009, Principal Smith told her

that "black kids can't learn in a cooking class because all they want to do is eat." JA 453.

At some point, Principal Smith and Mr. Tolbert both inspected Mr. Tolbert's classroom. Mr. Tolbert claims that he showed Principal Smith areas in the classroom that had not been cleaned by the janitorial staff, and Principal Smith remarked that "the kids we get to this school are not from much better than this." JA 335. Because of the demographics of the John Marshall student body, Mr. Tolbert interpreted this comment as a reference to the students' race. And in the beginning of the 2008-2009 school year, Barbara Postell, then a counselor at John Marshall, asserts that Principal Smith—when referring to John Marshall students—stated that "my friends, they are not like us." JA 457. Ms. Postell interpreted this as a comment about the students' race. Principal Smith denies making any of these statements.

Mr. Tolbert also claims that Principal Smith told him and his students that the Monroe County Department of Health had closed the kitchen in Mr. Tolbert's classroom. That statement, according to Mr. Tolbert, was incorrect; Principal Smith had closed the kitchen.

**D.**

Mr. Tolbert received three Formal Teacher Evaluations during the 2008-2009 school year. In November 2008, Ms. Avery-DeToy observed one of Mr. Tolbert's classes and submitted a lengthy and negative evaluation. She rated his performance as "Unsatisfactory," the lowest of the five options.

In December 2008, Anthony Bianchi observed one of Mr. Tolbert's classes and concluded that Mr. Tolbert had met professional standards. In March 2009, Mr. Tolbert requested that someone other than Ms. Avery-DeToy conduct his next evaluation, and Principal Smith assigned the review to Jason Muhammad. After observing an April 6, 2009, class, Mr. Muhammad concluded that Mr. Tolbert had met professional standards.

In March 2009, the "Administrative Team" at John Marshall sent a memorandum to the teaching staff. The memo discussed year-end evaluations and identified which administrator would review each teacher. According to the memo, Mr. Muhammad would conduct Mr. Tolbert's annual evaluation. But Principal Smith later reassigned the evaluation to Ms. Avery-DeToy, the only administrator who had previously rated Mr. Tolbert's performance as "Unsatisfactory." Mr. Tolbert claims that he received no notice of the reassignment.

Mr. Tolbert's annual evaluation was not positive. For twelve of the eighteen categories, Ms. Avery-DeToy described Mr.

8

Tolbert's teaching as "Below Professional Standards." For the remaining six categories, Mr. Tolbert received marks of "Meets Professional Standards." The Overall Summary Rating was "Below Professional Standards." The comment sections noted that Mr. Tolbert had shown some growth, but expressed concern about his teaching strategy, professional development, and lack of involvement with his students' parents. In the end, Ms. Avery-DeToy recommended denying Mr. Tolbert tenure.

Principal Smith agreed, but he recommended that Mr. Tolbert receive a fourth year of probation. Principal Smith declared that he made this decision "[b]ased on Tolbert's observations throughout 2008–2009, his final evaluation and my own observations of his performance." JA 45. Principal Smith and Ms. Avery-DeToy informed Mr. Tolbert of the decision in April 2009.

Mr. Tolbert refused the fourth-year-probation offer. Accordingly, a recommendation against granting Mr. Tolbert tenure was forwarded to the Rochester City School Board. Although the School Board did not approve the denial of tenure, Superintendent Jean-Claude Brizard made a "final decision" to deny tenure. Superintendent Brizard testified that his decision was based on Principal Smith's recommendation and the reviews of Mr. Tolbert from "the last year and part before that." JA 260.

9

By a letter dated August 31, 2009, the School District informed Mr. Tolbert that he would not receive tenure. The School District again offered Mr. Tolbert a fourth year of probation, which he refused.

**E.**

Mr. Tolbert filed his original complaint in November 2009. After an amendment, the complaint alleged a claim for racial discrimination arising under 42 U.S.C. § 1981 and a claim for defamation against Principal Smith. Against the School District, the plaintiff alleged that he was subjected to discrimination and a hostile work environment because of his race, in violation of Title VII and the NYSHRL.[2]

The defendants filed a motion for summary judgment on all claims, which the district court granted. The district court dismissed the discrimination claims because it found that Mr. Tolbert had failed to establish a prima facie case of discrimination because he had not suffered an adverse employment action and had failed to raise an inference of discrimination.

---

[2] The defendants suggest, without elaboration, that the plaintiff did not timely exhaust his administrative remedies before the Equal Employment Opportunity Commission with respect to his Title VII claims. The defendants do not explain this argument in their brief. The district court noted that an argument of non-exhaustion had been raised but never decided it. Therefore, we do not reach the issue of non-exhaustion and any appropriate argument of non-exhaustion can be addressed on remand.

It dismissed the hostile work environment claims because it concluded that the alleged hostility was not a result of Mr. Tolbert's race and was not sufficiently severe. And the district court dismissed the defamation claim because the complaint failed to allege when or to whom the defamatory statements were made.

Mr. Tolbert timely appealed.

**II.**

We have jurisdiction pursuant to 28 U.S.C. § 1291, and the district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

We review a grant of summary judgment de novo, Velazco v. Columbus Citizens Found., 778 F.3d 409, 410 (2d Cir. 2015) (per curiam), and may affirm on any basis that finds support in the record. Mauro v. S. New England Telecomms., Inc., 208 F.3d 384, 387 n.2 (2d Cir. 2000) (per curiam). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In determining whether summary judgment is appropriate, we must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

This Court has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008). At the same time, we have also made it clear that "the salutary purposes of summary judgment—avoiding protracted and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (internal quotation marks omitted).

**III.**

Mr. Tolbert alleged a racial discrimination claim against Principal Smith under § 1981, and a racial discrimination claim against the School District under Title VII and the NYSHRL. The Title VII, § 1981, and NYSHRL discrimination claims are governed at the summary judgment stage by the burden-shifting analysis first established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973). See Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012). Although the § 1981 claim is against Principal Smith and the Title VII and NYSHRL claims are against the School District, the analysis is the same.[3] The claims against both defendants turn on Principal Smith's conduct.[4]

---

[3] Section 1981 provides for individual liability. Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir.

12

Under the McDonnell Douglas framework, Mr. Tolbert bears the burden of establishing a prima facie case of discrimination by showing "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Brown, 673 F.3d at 150 (internal quotation marks omitted). "The requirement is neither onerous nor intended to be rigid, mechanized or ritualistic." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001) (internal citations and quotation marks omitted).

There is no disagreement that as an African American, Mr. Tolbert is a member of a protected class. Nor do the defendants question Mr. Tolbert's qualifications. The defendants, however, argue that Mr. Tolbert did not suffer an adverse employment

2000). Title VII does not. Spiegel v. Schulmann, 604 F.3d 72, 79 (2d Cir. 2010) (per curiam). The NYSHRL provides for individual liability under an aiding-and-abetting theory, see Feingold v. New York, 366 F.3d 138, 157–58 (2d Cir. 2004), but the plaintiff made no such claim against Principal Smith.

[4] Although Superintendent Brizard made the ultimate tenure decision, he relied on Principal Smith's recommendation. And "the impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision in violation of Title VII. This is true even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the promotion process." Bickerstaff v. Vassar Coll., 196 F.3d 435, 450 (2d Cir. 1999) (internal citation omitted).

action and that there is no evidence giving rise to an inference of discrimination.  We disagree.

**A.**

An employee suffers an "adverse employment action" if he "endures a materially adverse change in the terms and conditions of employment.  An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities."  Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) (internal citation and quotation marks omitted).  Denying Mr. Tolbert tenure and extending his probation was an adverse employment action.

In New York, teachers serve a three-year probationary period.  Then it is usually up or out: the teacher either receives tenure or is terminated.  But, as here, school districts may extend the probationary term for one year and postpone the tenure decision.  See Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 134 (2d Cir. 1995).

This Court has held or assumed that the denial of tenure is an adverse employment action under Title VII and other employment statutes.  See, e.g., Donnelly v. Greenburgh Cent. Sch. Dist. No. 7, 691 F.3d 134, 147 (2d Cir. 2012) (Family Medical Leave Act retaliation); Leibowitz v. Cornell Univ., 445 F.3d 586, 591–92 (2d Cir. 2006) (per curiam) (Title VII and the Age Discrimination in Employment Act); Back v. Hastings On

14

_Hudson Union Free Sch. Dist._, 365 F.3d 107, 113, 123–26 (2d Cir. 2004) (42 U.S.C. § 1983); _Zahorik v. Cornell Univ._, 729 F.2d 85, 93 (2d Cir. 1984) (Title VII); _see also_ _Okruhlik v. Univ. of Ark._, 395 F.3d 872, 879 (8th Cir. 2005) (Title VII and § 1983). This makes sense. Tenure is a material condition of employment because it provides long-term job security. _See_ _Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle_, 429 U.S. 274, 286 (1977) ("The long-term consequences of an award of tenure are of great moment both to the employee and to the employer.").[5]

But the defendants insist that this case is different because Mr. Tolbert was offered a fourth year of probationary employment. According to the defendants, Mr. Tolbert's employment situation would have been no worse had he accepted the offer.

The defendants ignore the fact that the offer of a fourth year of probation was intertwined with the denial of tenure. Had the plaintiff received tenure, he could have been terminated only for cause. But had he remained a probationary teacher, he could have been terminated for any lawful reason. N.Y. Educ.

---

[5]  In the context of university tenure decisions, "a prima facie case that a member of a protected class is qualified for tenure is made out by a showing that some significant portion of the departmental faculty, referrants or other scholars in the particular field hold a favorable view on the question." _Zahorik_, 729 F.2d at 93–94. That requirement does not apply to a prima facie case for an elementary or high school teacher. _Donnelly_, 691 F.3d at 151.

15

Law §§ 2573(1)(a), 2573(5)(a), 3020-a.  The denial of tenure therefore was the denial of a material improvement in the conditions of the plaintiff's employment.

Title VII prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment," § 2000e-2(a)(1), the NYSHRL similarly prohibits employers from "discriminat[ing] against such individual in compensation or in terms, conditions or privileges of employment," N.Y. Exec. Law § 296(1)(a), and § 1981 provides that all "persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," § 1981(a).  Refusing to award a contract or a material employment benefit for a discriminatory reason violates those statutes.  See, e.g., Zahorik, 729 F.2d at 93 ("Tenure decisions are not exempt under Title VII, . . . and plaintiffs seeking to show that forbidden purposes lurk in a tenure decision have available methods of challenging such decisions.")

Indeed, were we to accept the defendants' interpretation, then failure to promote claims—or any claims alleging the denial of an employment benefit—would be non-actionable.  And that cannot be the case.  "A benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free under the employment

16

contract simply not to provide the benefit at all." Hishon v. King & Spalding, 467 U.S. 69, 75 (1984).[6]

Extending an employment relationship by one year by itself may not qualify as an adverse employment action. But when coupled with the denial of tenure, it is assuredly an adverse employment action. During the fourth year of probationary employment, a teacher can be fired at any time for any lawful reason. N.Y. Educ. Law § 2573(1)(a). But if granted tenure, the teacher may be fired only for cause. Id. §§ 2573(5)(a), 3020-a. The denial of tenure after three years, when a teacher was otherwise eligible for tenure, does not become any less an adverse action because the teacher is provided with another year of probationary employment.

Of course, a school district may defer a decision on tenure and obtain another year's experience with a teacher, provided that the decision is not made for an unlawful reason such as racial discrimination. But the denial of tenure after three years cannot lawfully be based on a discriminatory reason, even if the teacher remains employed as a probationary teacher. The

---

[6]  Douglass v. Rochester City School District, 522 F. App'x 5 (2d Cir. 2013), an unpublished disposition upon which the defendants rely, is not to the contrary. In that case, the Court held that a fourth-year extension of probation did not place the plaintiff "in any worse employment position than she would have been in absent the offer." Id. at 9. However, this Court was careful to explain that the plaintiff did not "assert a claim for discriminatory denial of tenure." Id. at 9 n.1. Mr. Tolbert asserts that claim here.

plaintiff alleges that is precisely what occurred here, and that is a sufficient allegation of an adverse action.

**B.**

The defendants next contend that Mr. Tolbert did not identify facts giving rise to an inference of discrimination.

Mr. Tolbert identified racially offensive comments allegedly made by Principal Smith, two of which concerned Mr. Tolbert's qualifications as a teacher. According to Mr. Tolbert, in the fall of 2008, Principal Smith asked him: "Do you only know how to cook black, or can you cook American too?" One of Mr. Tolbert's students declared that in January 2009, Principal Smith asked her "how [she] expected to learn if all [she] was learning to cook was black food." JA 450. Another student declared that in January or February of 2009, Principal Smith told her that "black kids can't learn in a cooking class because all they want to do is eat."[7] JA 453.

---

[7] As the district court found, the other evidence cited by the plaintiff does not raise an inference of discrimination. Reverend Willie Harvey and Barbara Postell declared that Malik Evans told them that Principal Smith was racist, but Reverend Harvey's and Ms. Postell's testimony would be inadmissible hearsay if offered at trial. Finnegan v. Bd. of Educ., 30 F.3d 273, 274 (2d Cir. 1994) (per curiam) (explaining that "double hearsay" cannot "create a genuine issue to be tried"); see also Fed. R. Civ. P. 56(c)(2). Cynthia Elliott's testimony that she "believe[d]" Principal Smith's decision to deny tenure "was based on race" is mere speculation. JA 264; see Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999) (noting that courts must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that

18

When responding to Mr. Tolbert's discrimination claims, the defendants did not discuss any of these remarks in their briefs to this Court or in their briefs before the district court. The district court nonetheless found that Principal Smith's "stray remarks" were "too attenuated" from the tenure decision and not probative of Principal Smith's intent. Tolbert v. Smith, No. 09cv6579, 2014 WL 906158, at *15–16 (W.D.N.Y. Mar. 7, 2014).

"[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." Tomassi v. Insignia Fin. Grp., Inc., 478 F.3d 111, 115 (2d Cir. 2007), abrogated on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177–78 (2009). But there is no bright-line rule for when remarks become "too attenuated" to be significant to a determination of discriminatory intent.

In April 2009, Principal Smith and Ms. Avery-DeToy told Mr. Tolbert that he would not receive tenure, and the two "black food" remarks concerning Mr. Tolbert were made in the fall of

gives rise to mere speculation and conjecture"). And Allen Williams's testimony that Superintendent Brizard said that there was a problem with Principal Smith is inadmissible hearsay and does not raise an inference of discrimination. Ms. Postell thought that she was also the victim of discrimination and filed a complaint with the Employment Equal Opportunity Commission. But the complaint was found to be without merit, and the district court here fairly concluded that it had "little probative value." Tolbert v. Smith, No. 09cv6579, 2014 WL 906158, at *7 (W.D.N.Y. Mar. 7, 2014).

19

2008 and in January 2009. The remarks all occurred during a single school year, and one occurred within three months of Principal Smith's decision to recommend that Mr. Tolbert be denied tenure. A third alleged remark in January or February 2009 attributed to Principal Smith also reflected racial bias. None of the remarks was so attenuated that it should be ignored.

Moreover, the remarks were made by the de facto decisionmaker, the remarks clearly suggest racial bias, and two of the comments were about Tolbert's qualifications as a teacher. And Principal Smith's comment to a student that "black kids can't learn in a cooking class because all they want to do is eat," JA 453, could be viewed as evidence of a discriminatory intent on Principal Smith's part in dismantling John Marshall's culinary arts program. The fate of that program, for which Mr. Tolbert was the only teacher at John Marshall, was directly relevant to the decision whether to grant him tenure. See Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 149–50 (2d Cir. 2010) (noting factors that district courts consider when determining if a remark is probative of discriminatory intent).[8] But the district court appeared to find that because the formal evaluations did not refer to Mr. Tolbert's race, there was no

---

[8] The two other allegedly racist remarks by Principal Smith—that the students "are not from much better than this" and that "they are not like us"—are less probative.

20

"nexus" between the decision to deny tenure and Principal Smith's remarks.  Tolbert, 2014 WL 906158, at *16.

Employers are unlikely to leave a "smoking gun" admitting a discriminatory motive.  See, e.g., Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  And such evidence is not required to make a prima facie case of discrimination.  Luciano v. Olsten Corp., 110 F.3d 210, 215 (2d Cir. 1997).  The plaintiff need not show that Principal Smith declared that the tenure decision was tied to the plaintiff's race.  Statements showing an employer's racial bias, which Mr. Tolbert identified, are sufficient to support a prima facie case of discrimination.  See id.

Moreover, there is a factual dispute as to whether Principal Smith followed regular procedures when he evaluated Mr. Tolbert for tenure.  "Departures from procedural regularity, such as a failure to collect all available evidence, can raise a question as to the good faith of the process where the departure may reasonably affect the decision."  Zahorik, 729 F.2d at 93.

The plaintiff submitted evidence that Principal Smith changed the person who conducted Mr. Tolbert's year-end evaluation without providing notice to Mr. Tolbert,[9] that

---

[9] While the defendants assert that Mr. Tolbert's evaluation was reassigned because Mr. Muhammad was having difficulty completing his evaluations on time, it is for a jury to decide whether that explanation is credible and rebuts any inference of

21

Principal Smith relied on the 2008–2009 evaluations in isolation, and that the unsatisfactory performance reviews by Ms. Avery-DeToy were aberrational.  These irregularities, when combined with Principal Smith's alleged remarks, are sufficient to establish a prima facie case of discrimination.  See Back, 365 F.3d at 124–25 (finding sexist remarks and procedural irregularities sufficient to rebut a nondiscriminatory reason for denying tenure).

There was no argument in the district court or before us that summary judgment should be granted at the second or third stages of the McDonnell Douglas analysis.  Therefore, because we conclude that Mr. Tolbert met his initial burden of establishing a prima facie case of discrimination, we vacate and remand with respect to the § 1981, Title VII, and NYSHRL discrimination claims.

---

discrimination that could be drawn from the alleged procedural irregularity.

**IV.**

We next consider whether the district court erred by granting summary judgment dismissing the hostile work environment and defamation claims. We conclude that it did not.

**A.**

Mr. Tolbert asserted hostile work environment claims against the School District under Title VII and the NYSHRL.[10] Hostile work environment claims under Title VII and the NYSHRL are governed by the same standard. Summa v. Hofstra Univ., 708 F.3d 115, 123-24 (2d Cir. 2013). To establish a prima facie case of hostile work environment, the plaintiff must show that the discriminatory harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and "that a specific basis exists for imputing" the objectionable conduct to the employer. Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (internal quotation marks omitted). It is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic. Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002).

---

[10] A hostile work environment claim may be brought against an individual pursuant to § 1981. Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 151 n.6 (2d Cir. 2014). But the complaint asserts no such claim.

Mr. Tolbert failed to identify sufficient material facts showing that his work environment was objectively hostile and abusive. "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.' Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." Id. at 374 (internal citation omitted) (quoting Perry, 115 F.3d at 149).

Mr. Tolbert alleges that Principal Smith made two offensive statements in his presence. Only one—the remark regarding "black food"—necessarily concerns race. The other remark—that the students were "not from much better than this"—is ambiguous. And whatever the meaning of the remarks, they do not qualify as "a steady barrage of opprobrious racial comments" that altered the conditions of Mr. Tolbert's employment. Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks omitted).

Nor do the other alleged instances of hostility support a hostile work environment claim. Mr. Tolbert complains that he did not receive a budget. But Principal Smith did not give a lump-sum budget to any teacher; he instead requested that each teacher submit a request for supplies.

Mr. Tolbert contends that he lost the assistance of a paraprofessional. But the Special Education Administrator made

24

that decision because of budget cuts. And there is no evidence that the Special Education Administrator's decision was a product of racial animus.

More students were placed in Mr. Tolbert's classes for the 2008-2009 school year than in the previous two years. But after Mr. Tolbert protested, the class sizes were reduced. And there is no evidence that Principal Smith—or anyone with a discriminatory motive—initially assigned an excessive number of students to Mr. Tolbert's classes.

Finally, Mr. Tolbert alleges that the janitorial staff did not properly clean his classroom. But Mr. Tolbert's problems with the janitorial staff predated Principal Smith's arrival, and there is no evidence that the janitorial staff acted out of animus or at the direction of Principal Smith.

Accordingly, we affirm the dismissal of the hostile work environment claims.

**B.**

Mr. Tolbert next contends that the district court erred in dismissing the defamation claim against Principal Smith. The amended complaint identifies four defamatory statements, but Mr. Tolbert discusses one on appeal. He alleges that Principal Smith told Mr. Tolbert's students that the Monroe County Department of Health had closed the kitchen in Mr. Tolbert's

classroom. That statement, according to Mr. Tolbert, was incorrect; Principal Smith closed the kitchen.

A slanderous statement, by definition, must be false. "But in defamation law, as in life, determinations of fact and fiction are not zero-sum. In New York, a statement need not be completely true, but can be substantially true, as when the overall 'gist or substance of the challenged statement' is true." Chau v. Lewis, 771 F.3d 118, 129 (2d Cir. 2014) (quoting Printers II, Inc. v. Prof'ls Publ'g, Inc., 784 F.2d 141, 146–47 (2d Cir. 1986)); see also Kraus v. Brandstetter, 562 N.Y.S.2d 127, 130 (App. Div. 1990).

Principal Smith's statement was substantially true. In the fall of 2008, Principal Smith closed the kitchen after the Monroe County Department of Health had identified a number of sanitation problems. A Monroe County Department of Health Inspection Report Observation stated that in order for the kitchen to reopen, it needed to be reinspected. Although Principal Smith had "closed" the kitchen, the Monroe County Department of Health prohibited its reopening without an inspection. "Prevented reopening" is substantially similar to "closed."

Accordingly, we affirm the dismissal of Mr. Tolbert's defamation claim.

**CONCLUSION**

We have considered all of the arguments of the parties. To the extent not specifically addressed above, they are either moot or without merit. For the reasons explained above, we **AFFIRM** the judgment of the district court dismissing all claims, except that we **VACATE** the judgment of the district court dismissing the discrimination claims. The case is **REMANDED** for further proceedings consistent with this opinion.