15-888-cv
Graziadio v. Culinary Institute of America, *et al.*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2015

(Argued: January 25, 2016        Decided: March 17, 2016)

Docket No. 15-888-cv

─────────────────────────

CATHLEEN GRAZIADIO,

*Plaintiff-Appellant,*

– v. –

CULINARY INSTITUTE OF AMERICA, SHAYNAN GARRIOCH in her individual
capacity, LOREEN GARDELLA in her individual capacity,

*Defendants-Appellees.*

─────────────────────────

Before: CALABRESI, LYNCH, LOHIER, *Circuit Judges.*

Plaintiff Cathleen Graziadio, an employee at the Culinary Institute of America ("CIA"), took leave under the Family and Medical Leave Act ("FMLA") to care for a son suffering from diabetes and took additional leave a few weeks later when her second son broke his leg. During Graziadio's second term of absence, CIA took issue with the paperwork supporting Graziadio's leave and refused to allow her to return until she provided new documentation. Communication between Graziadio and CIA broke down, and CIA ultimately fired Graziadio for abandoning her job. Graziadio subsequently sued CIA and two of her supervisors in the Southern District of New York (Román, *J.*), alleging interference and retaliation under the FMLA and discrimination under the Americans with Disabilities Act ("ADA"). The District Court granted summary judgment to defendants, finding that Graziadio could establish neither that she was wrongfully denied FMLA leave nor that CIA's actions were retaliatory or discriminatory. We conclude that Graziadio has presented genuine disputes as to material fact with respect to her claims of FMLA interference and FMLA retaliation, but that she has failed to adduce evidence supporting a claim of discrimination under the ADA. Accordingly, we affirm the judgment of the district court in part and vacate and remand it in part.

NATHANIEL K. CHARNY, Charny & Associates, Rhinebeck, NY, *for Plaintiff-Appellant*

JOSPEH J. LYNETT (Michael A. Frankel *on the brief*), Jackson Lewis P.C., White Plains, NY, *for Defendants-Appellees*

CALABRESI, *Circuit Judge*:

Cathleen Graziadio was fired from her position at the Culinary Institute of America shortly after she took leave to provide medical care for her sons and engaged in a protracted dispute about the validity of that leave. She subsequently brought suit under the Family and Medical Leave Act and the Americans with Disabilities Act, alleging that she had been wrongfully denied leave, retaliated against for taking leave, and discriminated against on the basis of her association with a disabled individual. The district court granted summary judgment to defendants on all claims. We sustain the court's rejection of Graziadio's discrimination claim, but we find that Graziadio has presented sufficient evidence to withstand summary judgment on her claims under the Family and Medical Leave Act. We therefore affirm in part, vacate in part, and remand for further proceedings.

## BACKGROUND

From 2007 until the events described below, Cathleen Graziadio worked as a Payroll Administrator at the Culinary Institute of America ("CIA"), processing student payroll and helping with students' administrative needs. On June 6, 2012, Graziadio's seventeen-year-old son, Vincent, was hospitalized as a result of previously undiagnosed Type I diabetes, and Graziadio promptly informed her supervisor, Loreen Gardella, that she would need to leave work to take care of him. Seeking to have her absence designated as leave under the

Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, she asked Mary Maffia, the payroll employee who processed FMLA documentation, to provide her with any necessary FMLA paperwork, which Maffia forwarded later that day. Graziadio returned to work on June 18, 2012, and, on or about June 27, 2012, submitted a medical certification supporting her need for leave to care for Vincent.

That same day, June 27, Graziadio's twelve-year-old son, T.J., fractured his leg playing basketball and underwent surgery for the injury. Again, Graziadio promptly notified Gardella that she would need immediate leave to care for her son and that she expected to return the week of July 9, "at least part time." J. App'x 239. When July 9 arrived, Gardella asked for an update on Graziadio's return, to which Graziadio responded that she would need to work a reduced, three-day week schedule until mid-to-late August and could return on Thursday, July 12, if that schedule was approved. She also asked, as she had in prior emails to Gardella, if there was "any further documentation that [CIA] may need from me." J. App'x 250. At this point, Gardella reached out to Shaynan Garrioch, CIA's Director of Human Resources, concerning Graziadio's request and the appropriate response to it.

Despite numerous calls and emails by Graziadio seeking to find out when she could resume work, neither Gardella nor Garrioch responded to Graziadio until July 17. Garrioch then sent Graziadio a letter stating that Graziadio's FMLA paperwork did not justify her absences from the workplace and that Graziadio must "provide updated paperwork to this office which addresses this deficiency." J. App'x 258. Garrioch also noted that Graziadio "ha[d] continued to be absent from the workplace due to the health condition of another one of [her] children" and that she would "also need to submit paperwork for this time off

3

from work as well." *Id.* Garrioch added that this paperwork had to be submitted within seven days for Graziadio's absences to be approved.

On getting this letter, Graziadio sent Garrioch a series of emails attempting to explain her situation and to determine what "paperwork" CIA wanted. She noted that she had repeatedly "asked if the Culinary would need further paperwork regarding [T.J.'s] accident to take the time off" but had "not received any reply to any of these emails and phone calls," and that she was "not clear on what paperwork you would like me to obtain," as she had not received any FMLA forms from CIA to be given to T.J.'s doctor. J. App'x 260. She also stated her intention to contact T.J.'s doctor "to obtain a note for the three days a week reduced schedule," "under the assumption that this will be enough paperwork" because she "ha[d] not heard from the CIA regarding what paperwork they specifically want." J. App'x 264. Lastly, Graziadio made clear that she planned to return to work the following week on that reduced schedule.

Garrioch responded on July 20 by emailing Graziadio "an informational brochure from the department of labor to assist you in understanding the FMLA statute and the CIA's position with respect to your leave." J. App'x 266. Garrioch then reiterated the asserted deficiencies in the certification submitted for Vincent, stating that the "certification that you did submit stated [only that] there would be doctor's appointments every three months," but "you have been absent from the workplace since early June, save for a few partial days near the end of June." *Id.* She also noted that "[i]f there is other documentation pertaining to your other son and absences required from the office for his care, you must provide that documentation as well, as we have no paperwork on any medical need pertaining to your absence for his care to date." *Id.*

4

Graziadio replied later that day, reaffirming her need to work a reduced schedule, promising that T.J.'s doctor would "provide . . . a note to this effect," and requesting "for I believe at least the sixth time now FMLA paperwork for him," if Garrioch wanted specific FMLA forms completed. J. App'x 276. She also restated her intention to return to work the next week. Garrioch wrote back three days later, insisting that CIA continued not to have paperwork justifying Graziadio's return to work and that she would not approve any schedule until new paperwork had been submitted. Garrioch also rejected the note from T.J.'s doctor, which Graziadio had sent in that morning, as failing to establish a "medical necessity for you to provide full time medical care." J. App'x 278. Finally, she announced that she would "no longer be able to discuss this matter over email," and asked Graziadio to "[p]lease provide . . . three dates/times for this week that you are available to come into work and meet with me" in person. *Id.*

In an excruciating exchange, Graziadio and Garrioch then proceeded, over any number of days, to email back and forth about scheduling a meeting without actually arranging it: Garrioch would ask for dates and times, Graziadio would respond that she was "available whenever," Garrioch would again ask for specific times, Graziadio would insist that she was "available any time or day," and so on. Early on in this exchange, Graziadio also forwarded Garrioch an updated FMLA certification for Vincent, but Garrioch did not acknowledge receipt of the certification or otherwise respond to that email. At another point, Graziadio attempted to circumvent the circular exchange by simply "requesting to return to work" on a "full time regular schedule." J. App'x 284. Garrioch rejected this request and again insisted that Graziadio appear for a meeting before she could return to work.

5

Ultimately, no one set a time for a meeting, and Graziadio, facing persistent involuntary leave, retained an attorney. Her lawyer, Joseph Ranni, sent a letter to CIA's president on August 7, in which he reiterated that Graziadio wanted to return to work but could not do so because Garrioch found her FMLA documentation deficient and would not identify what other documentation was required. On August 30, 2012, Ranni had a conversation with CIA's counsel, in which, according to Ranni, "CIA continued to take the position that Ms. Graziadio would not be returned to work because she had not provided sufficient support to justify her absences" and insisted that "it was not the employer's obligation to explain what was missing from the paperwork and instead that it was Ms. Graziadio's obligation to comply with the statute." J. App'x 713. CIA also advised that it "would no longer communicate with Ms. Graziadio and all communications must occur between counsel." *Id.*

Later that day, CIA's attorney sent Ranni a follow-up email. It began by affirming that CIA's "understanding is that Ms. Graziadio wants to return to work," and stating that if Graziadio wanted to return to work, "she must contact her supervisor to arrange for her return to work." J. App'x 719. However, "[i]n the event Ms. Graziadio wants to return to work," it continued, "I also want to make perfectly clear Ms. Graziadio's obligation to submit FMLA medical certifications." *Id.* It then proceeded, for two paragraphs, to reiterate the alleged deficiencies in the medical documentation provided and to demand that Graziadio "provide two sufficient and complete FMLA medical certification forms" "by Monday," four days hence. *Id.* Ranni claims that, because he was being hospitalized for injuries sustained in a motorcycle accident, he did not see the email until September 4, at which point he and Graziadio began to formulate a response.

6

CIA fired Graziadio one week later. On September 11, 2012, before Graziadio had responded to CIA's email, Garrioch sent Graziadio a letter announcing that she had been terminated for abandoning her position. Garrioch explained that Graziadio had been asked "through your attorneys . . . to return to work and to contact your supervisor to arrange a return to work date. . . . Based on the fact that you have not contacted your supervisor to arrange to return to work as of the date of this letter, it is obvious to us that you do not want to return to work." J. App'x 292. Accordingly, CIA was "processing an administrative termination of your employment effective as of the date of this letter." *Id.*

Graziadio subsequently filed a complaint in the Southern District of New York (Román, *J.*), bringing claims against CIA, Garrioch, and Gardella for interference with FMLA leave, FMLA retaliation, and associational discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(b)(4). Defendants moved for summary judgment on all claims and, on March 20, 2015, the district court granted their motion in full. *Graziadio v. Culinary Inst. of Am.*, No. 13 Civ. 1082 (NSR), 2015 WL 1344327 (S.D.N.Y. Mar. 20, 2015). It first dismissed Graziadio's FMLA claims against Garrioch and Gardella individually, finding that neither qualified as an "employer" subject to liability under the FMLA. Next, it determined that Graziadio could not sustain her claims of FMLA interference because she had not been denied any leave to care for Vincent and, having failed to submit a medical certification form, had no entitlement to leave to care for T.J. Finally, it rejected Graziadio's FMLA retaliation and ADA discrimination claims, finding a) that defendants had proffered legitimate reasons for Graziadio's termination—namely, Graziadio's failure to comply with FMLA certification requirements and her failure to

7

contact her supervisor to return to work, and b) that Graziadio had not shown these reasons to be pretextual. It consequently dismissed the case.

Graziadio now appeals.

**DISCUSSION**

This Court reviews a grant of summary judgment *de novo*, resolving all ambiguities and drawing all reasonable inferences against the moving party. *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015). We will affirm the grant of summary judgment only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)).

**A. FMLA Claims**

**1. Individual Liability**

As a preliminary matter, Graziadio challenges the district court's conclusion that Garrioch does not constitute an "employer" under the FMLA and therefore cannot be held individually liable.[1] We agree with Graziadio because questions of material fact remain as to Garrioch's authority.

An individual may be held liable under the FMLA only if she is an "employer," which is defined as encompassing "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer," 29 U.S.C. § 2611(4)(A)(ii)(I); *see also* 29 C.F.R. § 825.104(d). The Second Circuit has not yet tested the contours of this provision, but several of our sister circuits, as well as district courts within this Circuit, have observed that the FMLA's definition of "employer" largely tracks the definition of "employer" used in the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203(d),

---

[1] Graziadio does not challenge the court's dismissal of her claims against Gardella. Pl's Br. at 1.

8

and have come to the reasoned conclusion that the standards used to evaluate "employers" under the FLSA should therefore be applied to govern the FMLA as well. *See, e.g.,* *Haybarger v. Lawrence Cty. Adult Prob. & Parole*, 667 F.3d 408, 417-18 (3d Cir. 2012) (noting that "[i]n analyzing an individual supervisor's control over the employee under the FLSA and the FMLA, most courts look to the 'economic reality' of the employment situation" and applying economic-reality analysis of FLSA cases to FMLA dispute); *Modica v. Taylor*, 465 F.3d 174, 186 (5th Cir. 2006) ("[W]e agree . . . that decisions interpreting the FLSA offer the best guidance for construing the term 'employer' as it is used in the FMLA.") (internal quotation marks omitted); *Wascura v. Carver*, 169 F.3d 683, 685-86 (11th Cir. 1999) (applying FLSA decisions to definition of "employer" under FMLA); *Santiago v. Dep't. of Transp.*, 50 F. Supp. 3d 136, 149 (D. Conn. 2014) ("In assessing individual liability under the FMLA, district courts within the Second Circuit have applied the [FLSA] test . . . to the FMLA because the FMLA definition of employer 'tracks that of the FLSA.'") (quoting *Smith v. Westchester Cty.*, 769 F. Supp. 2d 448, 475 (S.D.N.Y. 2011)). We agree with these courts and apply the economic-reality test used to analyze individual liability in the FLSA to the FMLA case before us.

Under this test, courts ask "whether the alleged employer possessed the power to control the worker[] in question, with an eye to the 'economic reality' presented by the facts of each case." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (citation omitted). To do so, they consider "a nonexclusive and overlapping set of factors," *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 75 (2d Cir. 2003), intended to "encompass[] the totality of circumstances," *Herman*, 172 F.3d at 139. These factors include "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled

9

employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)).[2] "No one of the four factors standing alone is dispositive . . . [and] any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition." *Id.* In the FMLA context, courts assessing the economic reality of an employment relationship have construed this test as asking essentially whether the putative employer "controlled in whole or in part plaintiff's rights under the FMLA." *Noia v. Orthopedic Assocs. of Long Island*, 93 F. Supp. 3d 13, 16 (E.D.N.Y. 2015).

The district court here dismissed Garrioch as a defendant, ruling that her relationship to Graziadio satisfied none of the listed factors. Instead, it found that Garrioch lacked meaningful "power to hire and fire" because Richard Mignault, CIA's Vice President of Administration and Shared Services, retained ultimate termination authority. And it further stated that Graziadio had "proffered no evidence . . . demonstrating that Garrioch supervised or controlled employee work schedules or conditions of employment, determined the rate and method of employee payment, or maintained employment records." *Graziadio*, 2015 WL 1344327, at * 5.

We conclude, however, that this analysis overlooks substantial evidence from which a rational trier of fact could find that Garrioch was an "employer" in economic reality and under the FMLA.

---

[2] We follow this approach rather than the one set out in *Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1998), because *Brock*'s test is "typically more relevant for distinguishing between independent contractors and employees," a distinction not at issue here. *Velez v. Sanchez*, 693 F.3d 308, 326 (2d Cir. 2012).

10

First, while termination authority formally rested with Mignault, Garrioch appears to have played an important role in the decision to fire Graziadio. Mignault admitted, for instance, that he conducted no independent investigation concerning Graziadio's leave dispute, but merely "directed th[e] issue to Ms. Garrioch for handling." J. App'x 175-76. In addition, Garrioch herself described Graziadio's termination as a joint "decision that was made between myself and Richard Mignault." J. App'x 609; *see also id.* ("[M]yself and Richard Mignault determined . . . that we were going to administratively terminate her employment."). Given these facts, "a jury could reasonably conclude that, but for the substantial authority wielded" by Garrioch, Mignault "would not have exercised his ultimate authority to fire" Graziadio, and therefore that Garrioch held substantial power over Graziadio's termination. *Haybarger*, 667 F.3d at 418-20 (finding that a supervisor may have "sufficient control over [a supervisee's] employment so as to be subject to liability for a violation of the FMLA" where, *inter alia*, "he advised [others] to terminate her" and thereby "exercised substantial authority over [the] termination decision, even if he lacked final authority to dismiss her"); *cf. Carter*, 735 F.2d at 12 ("It runs counter . . . to the Congressional intent to impose a qualification which permits an employer who exercises substantial control over a worker, but whose hiring decisions occasionally may be subjected to a third party's veto, to escape compliance with the [FLSA].").

Second, Graziadio presented evidence that Garrioch, as Director of Human Resources, exercised control over Graziadio's schedule and conditions of employment, at least with respect to her return from FMLA leave. Specifically, both Gardella and Maffia testified that Human Resources, and Human Resources alone, handled any employee's return to work after FMLA leave or that required work accommodations. J. App'x 155, 166-

11

67; *see also* J. App'x 558 ("Mine and Loreen [Gardella]'s hands are tied. . . [because] Shay [Garrioch] has taken over. So pretty much we're out of the loop. HR is now dealing with this").

Neither party put forward evidence concerning the rate and method of payment. And the maintenance-of-records factor does cut against finding Garrioch an employer, as the routine administration of FMLA leave was handled by the payroll department and, in particular, by Maffia. Nevertheless, on the overarching question of whether Garrioch "controlled plaintiff's rights under the FMLA," there seems to be ample evidence to support the conclusion that she did: deposition testimony and email exchanges demonstrate a) that Garrioch reviewed Graziadio's FMLA paperwork, b) that she determined its adequacy, c) that she controlled Graziadio's ability to return to work and under what conditions, and d) that she sent Graziadio nearly every communication regarding her leave and employment (including the letter ultimately communicating her termination). Indeed, Garrioch specifically instructed Gardella and Maffia that they were not to communicate with Graziadio and that Garrioch alone would handle Graziadio's leave dispute and return to work. *See, e.g.*, J. App'x 624 ("We were instructed by human resources that all communications [to Graziadio] would go through Shay [Garrioch]."); J. App'x 633-34 (Graziadio's supervisor did not review any of Graziadio's FMLA paperwork or participate in any conversations about its adequacy).

Given all this evidence, we conclude that a rational jury could find, under the totality of the circumstances, that Garrioch exercised sufficient control over Graziadio's employment to be subject to liability under the FMLA. We therefore vacate the district court's dismissal of FMLA claims against Garrioch.

12

### 2. FMLA Interference

To succeed on a claim of FMLA interference, a plaintiff must establish that the defendant denied or otherwise interfered with a benefit to which she was entitled under the FMLA. *See* 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise[] any right provided under this subchapter."); *see also Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004) (per curiam) (describing FMLA interference claims as "question[ing] . . . whether the employer in some manner impeded the employee's exercise of his or her right").

While this Court to date has not stated the requirements of a prima facie case of interference with FMLA rights in a published opinion, we have, in nonprecedential decisions, accepted the standard regularly used by district courts of this Circuit to analyze FMLA interference claims. *See, e.g.*, *Achille v. Chestnut Ridge Transp., Inc.*, 584 F. App'x 20, 21 (2d Cir. 2014) (summary order). We now formally adopt that standard.

Accordingly, to prevail on a claim of interference with her FMLA rights, a plaintiff must establish: 1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA.

The district court granted summary judgment to CIA on Graziadio's interference claim, concluding that Graziadio could not establish either a) that CIA had actually denied her leave to care for Vincent, or b) that she had fulfilled her obligation to provide an adequate medical certification and that she was therefore entitled to take leave for T.J. We reject each of these conclusions.

13

**a. Leave to Care for Vincent**

The district court first found that Graziadio was not denied any leave with regard to Vincent because she was permitted to take leave on June 7, was allowed to return to work on June 18, and "never actually sought to take additional leave for Vincent" after that time. *Graziadio*, 2015 WL 1344327, at *6. This, the district court said, rendered it "difficult to see how CIA could have interfered with [Graziadio's] alleged right to future leave for Vincent." *Id.* While the court rightly found no dispute regarding Graziadio's initial leave and return to work, we find that Graziadio has raised questions of material fact regarding both whether she took intermittent leave subsequent to her return to work and whether any such intermittent leave was approved. Consequently, Graziadio may be able to prove that she was denied leave to which she was entitled and thus to prevail on her claim of FMLA interference with respect to Vincent.

We note in particular the following evidence that Graziadio "actually sought to take additional leave for Vincent" following her initial return to work. First, CIA's Employee Attendance Sheet indicates that Graziadio took leave (there denoted as FMLA) on five days between June 18 and June 27, in durations ranging from one hour to one day. Additionally, Graziadio's declaration and Garrioch's acknowledgement that Graziaido worked "a few partial days near the end of June," J. App'x 266, likewise suggest that Graziadio drew down on leave for Vincent during this period. That Graziadio could not recall at her deposition whether she took such intermittent leave does not, as the district court suggested, decide the issue. It, instead, makes the question a disputed one that is appropriately resolved by a factfinder. Moreover, a jury could find that Graziadio's absence after June 27 was

14

attributable to ongoing care for Vincent as well as for T.J., further implicating the intermittent leave Graziadio had requested to care for Vincent.

Graziadio has also proffered evidence that CIA denied or withheld approval of this leave. For instance, in her July 17 letter to Graziadio, Garrioch indicated that, upon reviewing Graziadio's first certification, CIA would not approve FMLA leave for Vincent. *See* J. App'x 258 (stating that CIA "cannot . . . justify your absences from the workplace" and warning that if Graziadio does not "provide updated paperwork" concerning Vincent "within the next seven (7) days," those absences will "be considered unauthorized and may result in further employment action"). After Graziadio submitted a new certification, Garrioch did not respond or even acknowledge receipt, suggesting that she continued to withhold approval and that Graziadio's leave continued to be "considered unauthorized." Indeed, notwithstanding Graziadio's submission of updated paperwork, CIA maintained through the end of August that Graziadio "ha[d] not submitted a sufficient and complete FMLA medical certification form" for Vincent and that her failure to do so would "result [in] her absences being denied FMLA protection." J. App'x 290. Garrioch also indicated at her deposition that, at least in her opinion, it is possible that none of Graziadio's leave for Vincent was ever authorized by CIA.

Having thus adduced evidence that she both sought and was denied leave, Graziadio needs only to produce evidence that she was entitled to the leave denied her to make out a prima facie case of interference. The district court did not reach this issue. But we readily conclude that a jury could likewise find in her favor.

Defendants have not questioned the adequacy of Graziadio's notice to CIA of her need for leave or the timeliness of Graziadio's submission of a medical certification form

15

establishing Vincent's need for care. While defendants did question the sufficiency of that form and informed Graziadio on July 17 that it was deficient, Graziadio timely—within the seven-day period provided in the FMLA, *see* 29 C.F.R. § 825.305(c) ("The employer must provide the employee with seven calendar days . . . to cure any such deficiency.")—attempted to cure any deficiencies by sending Garrioch a new certification on July 24. That certification explained that Vincent would need to visit a doctor every 3 months for 1-2 hours and that he might have "episodic flare-ups" and "sick & recovery days requiring supervision and ongoing treatment," which are "unpredictable and necessitate immediate action." J. App'x 482. It also estimated that Vincent might have one such episode a week, and that this would generally allow Graziadio to return to work for 4-8 hours a day, 5 days a week. A jury could find that this form met the statutory requirements for certification and that it supported Graziadio's request for ongoing, intermittent leave to care for Vincent, thereby entitling Graziadio to intermittent leave.[3]

Accordingly, we find that Graziadio has put forward evidence that she was entitled to take leave, that she attempted to take leave, and that CIA refused to approve that leave. Graziadio's FMLA interference claims with respect to Vincent therefore survive summary judgment.

**b. Leave to Care for T.J.**

The district court next determined that Graziadio was not entitled to FMLA leave, and thus could not sustain an interference claim, with respect to T.J. because she failed to submit a valid medical certification supporting that leave. We find, however, that a jury

---

[3] Because Graziadio did submit an updated and arguably adequate certification form within the time period specified by CIA's July 17 letter, we need not reach her argument that CIA's request for an updated certification was untimely; she was not prejudiced by any delay.

16

could conclude that Graziadio attempted in good faith to comply with CIA's certification requests and that defendants' conduct excused any residual failure in compliance.

We note at the outset that, contrary to defendants' suggestion, Graziadio was not required to provide a medical certification at the time of her request for leave. Under the FMLA, an employee seeking leave need not submit a medical certification *unless and until one is specifically requested by her employer*. *See* 29 C.F.R. § 825.305(a). Neither the fact that CIA maintained a handbook stating that it required medical certification nor the fact that CIA had recently given Graziadio a Notice of Rights and Responsibilities, which explained the medical certification requirement, sufficed to put Graziadio on notice that medical certification was required for *this* leave claim, as "[a]n employer must give notice of a requirement for certification each time a certification is required." *Id.*; *see also Perry v. Jaguar of Troy*, 353 F.3d 510, 514 (6th Cir. 2003) ("Even though the need for medical certification was stated in defendant's employee handbook, the regulations required defendant again to ask for certification after [plaintiff] told his supervisor he wanted leave . . . .").

No request for certification, however, was made with respect to T.J. until, at the earliest, July 17. It was then that Garrioch sent Graziadio a letter concerning asserted deficiencies in the certification submitted for Vincent.[4] Toward the bottom of that letter, Garrioch informed Graziadio that in order to "continue[] to be absent from the workplace due to the health condition of another one of your children," "[y]ou will also need to submit paperwork for this time off from work as well." J. App'x 258. This vague request for

[4] While Graziadio argues that this request for certification was untimely and therefore improper, *see* 29 C.F.R. § 825.305(b) ("[T]he employer should request that an employee furnish certification at the time the employee gives notice of the need for leave or within five business days thereafter . . . ."), as the district court found, the amount of time Graziadio had been on full-time leave to care for T.J.'s broken leg permitted the CIA to seek late certification. *See id.* ("The employer may request certification at some later date if the employer later has reason to question the appropriateness of the leave or its duration.").

17

"paperwork," however, hardly sufficed to give Graziadio adequate notice that CIA was requesting a medical certification for T.J. This is particularly so given Graziadio's prior, repeated requests that CIA state precisely what "paperwork" it required for T.J. and provide her with any specific forms it wished her to complete. (Providing such forms, a jury could find, was usual CIA practice.)

Furthermore, to the extent this letter could, nonetheless, be interpreted as requesting a medical certification for T.J., it misstated the time in which Graziadio had to submit one such certification. Garrioch concluded her letter by demanding that Graziadio "provide the necessary paperwork" "within the next seven (7) days," erroneously conflating Graziadio's time to submit original paperwork for T.J.—which is at least fifteen days under the Act, *see* 29 C.F.R. § 825.305(b)—with her more limited time to cure Vincent's certification. We are, consequently, disinclined to find that this letter's vague and potentially misleading instructions entitled CIA, as a matter of law, to receive a certification for T.J. that Graziadio failed to provide.

Garrioch did attempt to restate and clarify her request for a certification a few days later. After receiving several further emails from Graziadio expressing confusion about "what paperwork you would like me to obtain," J. App'x 260, Garrioch emailed Graziadio a Department of Labor brochure and told Graziadio to conform to the "requirements about the evidence or certifications that must be required in order for you to be approved for FMLA leave," J. App'x 266. She further informed Graziadio that "[i]f there is other documentation pertaining to your other son and absences required from the office for his care, you must provide that documentation as well, as we have no paperwork on any medical need pertaining to your absence for his care to date." *Id.* By instructing Graziadio

18

to provide paperwork establishing a "medical need [for] your absences for his care," this email may, indeed, suffice to constitute a request for a medical certification.

We cannot help but note, however, that in making this still rather oblique request, Garrioch studiously avoided responding to any of Graziadio's pleas for clarification on "what [paperwork] you would specifically like me to obtain" and for transmission of any specific desired FMLA forms. J. App'x 260. And such unresponsiveness may itself run afoul of the FMLA's explicit requirement that employers "responsively answer questions from employees concerning their rights and responsibilities under the FMLA," including, *inter alia*, their obligations regarding medical certification, 29 C.F.R. § 825.300(c)(5)—a violation that could, perhaps, independently warrant a jury finding in favor of Graziadio. *Cf. Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 763-64 (7th Cir. 2008) (expressing concern at employer's deliberate unresponsiveness in light of FMLA's directive "to responsively answer questions from employees," but concluding that unresponsiveness did not give rise to an interference claim because employer ultimately provided plaintiff "with the FMLA forms she needed").

Graziadio nevertheless attempted to comply with Garrioch's request: she submitted a note from T.J.'s doctor supporting her current request to work a reduced schedule to care for T.J., "under the assumption that this w[ould] be enough paperwork" "[u]ntil [she] hear[d] to the contrary" or received other forms from CIA. J. App'x 264. Garrioch quickly rejected the note as not justifying Graziadio's absence because it did "not state that there was any medical necessity for you to provide full time medical care," J. App'x 278, a reasonable rejection that would ordinarily require Graziadio to produce updated paperwork within seven days. However, immediately after notifying Graziadio of the

note's deficiency, Garrioch cut off communication by expressly refusing to discuss the matter further until Graziadio appeared for an in-person meeting.

Given this action by Garrioch, we conclude that a jury could find that it was reasonable for Graziadio to believe that she should not, or indeed could not, submit new medical information until she and Garrioch had met in person. Additionally, Garrioch's concurrent failure to acknowledge receipt of the updated certification form that Graziadio had provided for Vincent might well have signaled to Graziadio that further submissions as to T.J. would be futile. And, finally, Garrioch provided Graziadio with no deadline within which to submit a new certification for T.J. This, too, could be found by a factfinder to have led to a reasonable belief that Graziadio did not need to provide additional information in advance of their meeting.

That meeting, of course, never came to pass, and Garrioch never reopened the lines of communication.[5] Rather, defendants offered no further instruction concerning Graziadio's leave obligations until, on August 30, CIA's attorney demanded a new medical certification. By that time, Graziadio a) had been kept from work for nearly two months on the basis of her alleged failure to submit appropriate paperwork, b) had received no guidance concerning her leave dispute since Garrioch instituted her email embargo on July 23, and c) could communicate with defendants only through counsel.

---

[5] Garrioch made no effort to bring about such a meeting, even as she remained steadfast in her refusal to discuss Graziadio's leave obligations without a meeting. She simply declined to respond to Graziadio's pleas to meet "whenever," "the sooner the better," because they did not include specific dates and times. J. App'x 483. It is true that Graziadio could as easily have suggested specific dates and times. But given Graziadio's eagerness to meet as soon as accommodated Garrioch—as evinced in statements like "if you are available tomorrow please let me know and I will come in," *id.*, and "Just send me a day and time, I believe this is more productive than me giving you three dates and times [because] you are busy," J. App'x 455—and given the employer's affirmative obligation to answer employees' FMLA questions responsively, a jury could find that Garrioch bore more of the burden to ensure the meeting took place, and thus more of the responsibility for its nonoccurrence.

Under these circumstances, a jury could conclude that Graziadio made sufficient good faith efforts to comply with her employer's requests and that defendants' conduct—their imprecision in requesting certification, their failure to answer Graziadio's questions responsively, and their failure to communicate with Graziadio after deeming her doctor's note deficient—relieved Graziadio of any unsatisfied obligation to provide a medical certification to support her leave. Freed of this obligation, Graziadio may well have been entitled to leave to care for T.J. and may, therefore, be able to show that defendants interfered with that leave. Accordingly, we find that Graziadio has raised issues of material fact concerning her entitlement to leave for T.J. that are sufficient to preclude dismissal of her claim for FMLA interference.

### 3. FMLA Retaliation

We will analyze the retaliation claims brought pursuant to the FMLA under the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Potenza*, 365 F.3d at 168. "To establish a prima faci[e] case of FMLA retaliation, a plaintiff must establish that 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent."[6] *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012) (internal quotation marks omitted). If the plaintiff makes out a prima facie case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does

---

[6] We need not now decide whether the Supreme Court's recent decision *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013), which held that "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action" rather than merely a motivating factor, *id.* at 2528, applies in the context of FMLA retaliation, as we conclude that Graziadio's claims would survive summary judgment under either causation standard.

so, the plaintiff must then show that defendant's proffered explanation is pretextual. *See*

*Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996).**[7]**

Assuming, *arguendo*, that Graziadio could establish a prima facie case, the district court found that CIA had submitted evidence "establishing legitimate, non-discriminatory bases for terminating Plaintiff's employment: deficiencies in documentation supporting FMLA leave requests and leave taken; and a failure to contact CIA to arrange a return to work." *Graziadio*, 2015 WL 1344327, at *10. It then held that Graziadio had not shown that CIA's reasons were pretextual and dismissed the claim.

We disagree. In light of our conclusion that a jury can find that CIA interfered with Graziadio's leave, the first of the district court's grounds no longer supports a grant of summary judgment. If Graziadio did not fail to meet, or was relieved of, an obligation to provide a certification for T.J., then her failure to provide such a certification cannot constitute a legitimate basis for termination. And with regard to CIA's assertion that it properly fired Graziadio because she abandoned her job, Graziadio may be able to show that explanation to be unworthy of credence and hence pretextual.[8]

---

[7] We employ the *McDonnell Douglas* test because a) the district court and both parties assumed its application, b) *Potenza* indicated that it should be applied in FMLA cases, and c) most of our sister circuits have applied it in FMLA cases. *See, e.g.*, *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3rd Cir. 2012); *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006); *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 550-51 (4th Cir. 2006); *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001); *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 798 (11th Cir. 2000); *Chaffin v. John H. Carter Co.*, 179 F.3d 316, 319 (5th Cir. 1999); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 891-92 (7th Cir. 1999); *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir. 1998); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). We note, however, that the Ninth Circuit in *Bachelder v. American West Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001), applied a test that was more favorable to claimants, and that in *Donnelly* we expressly left open whether "the burden-shifting framework from the context of employment discrimination [should be applied] to FMLA retaliation," 691 F.3d at 152. Since we find that Graziadio meets the stricter *McDonnell Douglas* test, we need not decide today whether an easier test should govern.

[8] Defendants also argue that Graziadio cannot make out a prima facie case 1) because she cannot establish a connection between her leave for Vincent and her termination, as she was reinstated on June 18 and

"A plaintiff may prove . . . retaliation . . . by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. . . . [O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision."). In the case before us, the weakness of the evidence supporting defendants' claim of abandonment permits a jury to disbelieve and to disregard their proffered explanation. In particular, Graziadio may be able to show that it would have been unreasonable for defendants to believe she had abandoned her position and, thus, that such a belief could not have motivated her termination.

Taking the evidence in the light most favorable to Graziadio, Graziadio received one instruction, in the August 30 email from CIA's attorney, that "[i]f she want[ed] to return to work, . . . she must contact her supervisor to arrange for her return to work." J. App'x 719. Immediately following this statement were two paragraphs reiterating that "[i]n the event Ms. Graziadio wants to return to work, [she must fulfill her] obligation to submit FMLA

took no further leave for Vincent, and 2) because she cannot establish that she was entitled to take leave for T.J. and thus exercised rights protected by the FMLA. These arguments, however, merely restate defendants' arguments in opposition to Graziadio's interference claim, both of which we have rejected as involving questions of material fact. These arguments thus present no barrier to Graziadio's ability to make out a prima facie case with respect to her termination.

23

medical certifications" and that her paperwork remained deficient.  Given that, for the preceding two months, Garrioch had refused to allow Graziadio to return to work until she submitted new paperwork, it would have been reasonable for Graziadio to read this email as taking the same position: i.e., in order to return to work, you must submit appropriate paperwork and, presumably in or after doing so, you must contact your supervisor.

It is, moreover, difficult, to put it mildly, to accept defendants' argument that the email for the first time divorced Graziadio's return to work from her leave dispute and made clear to Graziadio that, in order to return, she had only to contact her supervisor.  It is likewise hard to conclude that, wholly irrespective of whether she submitted new "paperwork," and on no particular deadline, she could simply come back to work.  But such dubious conclusions are needed to support the claim that Graziadio's failure to contact her supervisor evinces a clear intent to abandon her job.  Significantly, defendants adduced no other evidence suggesting a lack of desire or willingness by Graziadio to return to work.  They cite only Graziadio's failure to contact a supervisor after August 30, in conjunction with her counsel's tentative discussions with CIA of the possibility of a severance package, to support their claim that Graziadio renounced her position.  Indeed, CIA maintained through August 30 that its own "understanding [wa]s that Ms. Graziadio wants to return to work."  J. App'x 719.  We do not doubt that a jury could reject defendants' claim of abandonment as false or implausible.[9]

---

[9] In fact, the New York State Department of Labor reached just that conclusion.  In awarding Graziadio unemployment benefits over CIA's objection, the Department specifically noted that Graziadio had "provided multiple emails, requests for a meeting, requests for FMLA information with no response or inconclusive responses.  [Defendants'] claim she did not want to return is contrary to all information on file.  She did all she could to protect her job & was told she could not."  J. App'x 543.

24

The weakness of the evidence supporting the defendant's explanation, considered in conjunction with the very close temporal proximity between Graziadio's leave and her termination, would then permit the conclusion that defendants' decision to fire Graziadio arose not from her "abandonment" of her position but from her much-contested attempt to take FMLA leave. *See Zann Kwan*, 737 F.3d at 847 ("[T]emporal proximity, together with other evidence such as inconsistent [or implausible] employer explanations, [may] defeat summary judgment . . . ."). There is no question but that defendants refused to reinstate Graziadio because she took leave that they declined to approve under the FMLA. It requires little imagination to infer that they fired her for the same reason.

If this weren't enough, Graziadio has also presented additional circumstantial evidence supporting a finding of pretext. She has shown, for instance, that CIA suspended her computer network access on August 15, well before she was told to contact her supervisor or thought to have abandoned her post. She has also presented testimony of an employee in the Human Resources department who said that, in his opinion, CIA intended to replace Graziadio as early as July, since, at that time, he was asked to compose a job description for a "temporary employee . . . and 'most likely' for a permanent replacement" for Graziadio.[10] J. App'x 726.

---

[10] That same Human Resources employee, Steven Botti, also averred that "[d]uring the entire period of my employment with the CIA, I noted that the upper levels of management had a preoccupation and disdain for employees who would be absent from work." J. App'x 725. Botti further testified that he too was terminated by Garrioch for taking leave under the FMLA and brought a lawsuit alleging such discrimination. Another former employee, Casey Harvell, averred that when she took leave under the FMLA, she received a "written memorandum advising me that I was being disciplined for taking time off to deal with my disability." J. App'x 737. Garrioch sent at least one letter to Harvell threatening disciplinary action. Harvell contended that, as in this case, "many of my absences were actually created by the CIA because they refused to return me to work . . . and forced me out of work for two additional weeks." J. App'x 739. The record also includes a "Compliance Action Report" from the Department of Labor's Wage and Hour Division, which concludes that "CIA violated Ms. Harvell's rights under FMLA

It is clear that Graziadio may be able successfully to contradict defendants' proffered explanations for her termination; her FMLA retaliation claims therefore survive summary judgment.

**B. ADA Claim**

Finally, Graziadio challenges the district court's dismissal of her claim brought pursuant to the ADA. The ADA prohibits, *inter alia*, "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). We have not yet had occasion to consider what standard should govern such rarely litigated claims of "associational discrimination." Doing so now, we join our sister circuits in holding that, to sustain an "associational discrimination" claim under the ADA, a plaintiff must first make out a prima facie case by establishing: 1) that she was qualified for the job at the time of an adverse employment action; 2) that she was subjected to adverse employment action; 3) that she was known at the time to have a relative or associate with a disability; and 4) that the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision. *See, e.g., Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 487 (6th Cir. 2011); *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1230-31 (11th Cir. 1999); *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997).

---

by failing to provide her with a proper and timely designation notice . . . [and] by giving her a negative performance appraisal because of her reduced attendance at work due to her various FMLA protected absences." J. App'x 749-50. A jury might well find that this information also supports Graziadio's claims under the FMLA.

26

In evaluating what circumstances serve to raise such an inference, we draw significant guidance from the Seventh Circuit's decision in *Larimer v. International Business Machines Corp.*, 370 F.3d 698 (7th Cir. 2004), which outlined "[t]hree types of situation[s]" or theories that would give rise to a claim of associational discrimination: 1) "expense," in which an employee suffers adverse action because of his association with a disabled individual covered by the employer's insurance, which the employer believes (rightly or wrongly) will be costly; 2) "disability by association," in which the employer fears that the employee may contract or is genetically predisposed to develop the disability of the person with whom he is associated; and 3) "distraction," in which the employer fears that the employee will be inattentive at work due to the disability of the disabled person.[11] *Id.* at 700.

Graziadio's claim concerns solely the "distraction" possibility, and implicates only distraction stemming from Graziadio's care for Vincent's diabetes, as Graziadio concedes that T.J.'s broken leg does not qualify as a disability. The district court dismissed this claim, finding that Graziadio had produced no evidence that she was fired because the employer believed that she would be "distracted" by Vincent and that, by contrast, Graziadio's reinstatement on June 18 following her leave to care for Vincent undercut any inference of discrimination.

---

[11] The Seventh Circuit noted that an employee who actually *is* sufficiently distracted at work that he would need an accommodation in work schedule would be not be entitled to one under the ADA "because the right to an accommodation, being limited to disabled employees, does not extend to a nondisabled associate of a disabled person." *Larimer*, 370 F.3d at 700. Such persons are not, however, entirely outside the protection of federal law; in at least some such cases, employees who require accommodation in their work schedule to care for a family member with a disability may be able to take FMLA leave, as Graziadio claims she should have been permitted to do in this case.

We agree. Graziadio has not presented evidence that she was fired because her employer suspected distraction or concern for Vincent would cause her to perform her work inadequately; rather, she has presented evidence that she was terminated because her employer felt she had taken too much leave *from work* to care for her sons. *Compare, e.g.*, *Detwiler v. Clark Metal Prods. Co.*, No. 08-1099, 2010 WL 1491325, at *30 (W.D. Pa. Mar. 19, 2010) (stating claim for associational discrimination where the reason given for termination was that plaintiff "had become 'an island' and was withdrawn from other employees," potentially from concern for husband's disability), *with Pennington v. Wal-mart Stores E.*, *LP*, No. 7:12-CV-860-SLB, 2014 WL 1259727, at *5 (N. D. Ala. Mar. 26, 2014) (finding no valid claim where the relative's disability "caused [plaintiff] to miss multiple days of scheduled work per month," because "[w]hat plaintiff needed . . . was an accommodation" and "federal law does not require employers to make reasonable accommodations for employees to care for their disabled relatives"). As such, Graziadio falls into *Larimer*'s reasonable-accommodation exception. She has not shown that her employer feared she would be "inattentive *at work*," but rather that her employer feared she would not be at work at all, because of a need for accommodation to which she was not entitled under the ADA. Accordingly, we find that Graziadio cannot sustain an ADA claim for associational discrimination.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the judgment of the District Court granting summary judgment to defendants on Graziadio's ADA claim, VACATE the judgment of the District Court granting summary judgment to defendants on Graziadio's FMLA claims, and REMAND the case for further proceedings consistent with this opinion.

28